James Lee HILL, Petitioner,

v.

Robert MOORE, Warden, Fort Pillow State Farm, Defendant.

No. C-78-2206.

United States District Court,
W. D. Tennessee, W. D.

March 25, 1981.

---

William Efird, Memphis, Tenn., for petitioner.

Charles L. Lewis, Asst. Atty. Gen., State of Tenn., Nashville, Tenn., for defendant.

## ORDER AFFIRMING MAGISTRATE'S REPORT

HORTON, District Judge.

Plaintiff originally filed this 28 U.S.C. § 2254 petition for a writ of habeas corpus, pro se and sought his release due to alleged constitutional violations in his arrest and

trial resulting in a life sentence based on a conviction of Murder in the First Degree in the Perpetration of a Robbery. Petitioner has exhausted all of his state remedies. This petition was referred to the United States Magistrate for a Report and Recommendation. The Magistrate issued a recommendation that the writ be denied. The Court then appointed an attorney to represent the plaintiff and the petitioner's attorney filed a brief in support of a rehearing, which this Court will treat as objections to the Magistrate's Report. The defendant filed a motion to affirm the Magistrate's Report or for summary judgment. After an independent examination of the transcript of petitioner's trial and all other documents filed in the cause, as well as the memoranda of both parties, the Court affirms the Report of the Magistrate and denies the writ.

Petitioner's conviction arose from the robbery of a Stop N Go market on April 19, 1973. Petitioner and another man shot the attendant in the stomach and robbed the cash register in the early hours of the morning. The attendant died as a result of his wounds. A witness, John Cannon, arrived during the course of the robbery and although he did not see the shooting of the attendant, he saw both robbers running from the building. At that time Mr. Cannon was twenty-five to thirty feet from the store and was emerging from his car on the parking lot. He testified that he had a complete and unobstructed view of the first man, the petitioner, as he ran from behind the counter and out of the door. Mr. Cannon attempted to duck behind his car door when the robbers spotted him and was fired upon by the petitioner and his accomplice. Petitioner had a small automatic pistol in his hand. Subsequently the attendant was found to have died from a gunshot wound caused by a .38 caliber bullet. One .38 caliber bullet was found lodged in a tape case in Cannon's back seat and one .25 caliber bullet was lodged in the pavement near Cannon's left front door. Several

spent .25 caliber cartridge cases were found outside the store. Mr. Cannon described the petitioner to police officers as a black male, approximately 5' 7" tall and weighing about 160 pounds.

Petitioner was not apprehended by the police as a result of that robbery. However, on June 11, 1973 police received a report of a robbery of two men and a bulletin was issued for a Buick with a black vinyl top over a brown body and bearing a drive-out tag in its rear window. The original broadcast stated that two black males were in the vehicle but a supplemental broadcast corrected it to three men. The arresting officers stopped an Oldsmobile with a brown vinyl top over a brown body which had a drive-out tag in its rear window and was occupied by four black males. The men were requested to leave the car. The petitioner emerged from the front passenger side of the vehicle. The men were then searched. The officers arrested the car's occupants and pulled from beneath the front passenger seat a bag containing several masks and a .38 revolver and a .25 automatic. These two guns were subsequently introduced into evidence in petitioner's trial.

On June 14, 1973 a member of the homicide bureau of the Memphis Police Department came to the home of John Cannon and showed him a group of five mug shots of young black males. Mr. Cannon was asked by the police officer if he could identify any of the people in this group.[1] Mr. Cannon testified that the officer did not attempt to influence him in any way and that none of the photos were outstanding in any way. The photograph of the petitioner was selected by Mr. Cannon as being a picture of the man who had shot at him. The police officer then requested Mr. Cannon to accompany him to the police station to view a line-up. Mr. Cannon agreed and was shown a line-up of seven young black males. While the trial exhibit of the photograph of the men in the line-up shows that the peti-

1. Mr. Cannon also testified that on a previous occasion the police had shown him other photographs but he did not identify any of these photographs as being of the man who had shot at him.

tioner was the shortest man in the line-up, Mr. Cannon testified that he did not notice whether the petitioner was shorter or taller than any of the other men in the line-up and that the petitioner did not stand out.[2] He stated that he looked at the line-up for three to four minutes and after carefully looking over each of the men, identified the petitioner. At the trial Mr. Cannon noted that the petitioner had lost weight and was smaller than when he had seen him in April but that his facial features were unchanged by the weight loss and that his hair was in the same thick style. Mr. Cannon stated that even if he had not viewed the five photographs or had not seen the line-up, he would be able to identify the petitioner as the man who had shot at him at the Stop N Go market.

On June 11, 1973 after his arrest and prior to some robbery line-ups the petitioner was given and signed three waiver cards for these line-ups. On June 14, 1973, prior to the homicide line-up the petitioner refused to sign the waiver card and the police officers called the Public Defenders Office and an attorney, Mr. William Ray Ingram, was sent over to represent three of the participants in the line-up, including the petitioner. Although the petitioner testified that he did not have an attorney at the homicide line-up, Mr. Ingram testified that he was present then for petitioner[3] and a police officer as well as Mr. Cannon testified that an attorney was present for petitioner at that time. The Court found that the evidence proved that petitioner was represented by an attorney at the line-up. Mr. Ingram testified that he saw nothing out of order in the line-up.

After the 2:20 PM line-up on June 14, 1973, Mr. Ingram left. At approximately 2:45 PM or 2:50 PM on that afternoon, a police officer read petitioner his rights and petitioner did not request an attorney be present even though Mr. Ingram had just been there to represent him at the line-up. However, the officer did not ask petitioner if petitioner would like to have Mr. Ingram return for the questioning. Petitioner was informed that he was under arrest for homicide in regard to the Stop N Go robbery on April 19, 1973. Petitioner was questioned about the .25 caliber and .38 caliber guns found in the car at the time of his arrest and voluntarily stated:

> They [the other men in the car with petitioner] got the pistol from my house. I had the pistols. The .25 is mine. We found the pistols. I don't know anything about no murder. My lawyer told me not to say nothing.

Once petitioner mentioned his attorney's warning, interrogation ceased. His statement was admitted into evidence at the trial after the trial judge found that the police had complied with *Miranda*. Also at the trial the jury was shown the mug shot of the petitioner, showing him in profile and full-face. The petitioner in the front view had a plaque around his neck which stated:

OLICE DEPT [sic]
MEMPHIS TENN
124523
5  28  73

The trial judge held that the photograph was admissible as not tending to show any prior criminal record of the petitioner because the date on the placard was after the date of the murder and robbery for which the petitioner was on trial. Therefore, the trial judge held the jury would only infer that this was the police photograph taken in connection with the arrest of the petitioner on the murder and robbery charges.

The petitioner's counsel in his brief raises the following four issues as grounds for the grant of a writ of habeas corpus: 1) Whether the use of the photographic identification

---

**2.** As Mr. Cannon pointed out in his testimony, the petitioner was wearing tennis shoes in the line-up whereas the other men had on shoes with heels. Therefore Mr. Cannon did not necessarily consider the petitioner to be shorter than the other men. He testified that the men were of the "same comparable size."

**3.** Although Mr. Ingram testified only from notes and could not recall if he had spoken to petitioner prior to the line-up, a police officer testified that Mr. Ingram did have a conversation with the petitioner.

procedure followed immediately by the in person line-up is so impermissibly suggestive as to create a substantial likelihood of irreparable misidentification; 2) Whether the introduction into evidence of the mug shots in which the petitioner's photograph with a police placard around his neck violated the petitioner's presumption of innocence under the 14th Amendment due process clause; 3) Whether the interrogation of the petitioner after the line-up and not in the presence of his counsel violated petitioner's constitutional rights; and 4) Whether the two pistols found in the car when petitioner was arrested should have been excluded from evidence as the fruits of an illegal search under the Fourth and Fourteenth Amendments. The defendant has stipulated that all of these issues were raised by petitioner in his appeal and that he has exhausted his state remedies as to them.

After this independent review of the evidence in the cause, the Court affirms the holdings of the Magistrate.

The Court does not find that the procedure by which the witness was shown several mug shots and after having selected the mug shots of the petitioner, was taken to police headquarters to view a line-up to be so impermissibly suggestive as to create substantial likelihood of irreparable misidentification. The constitution does not require that counsel be present during a pre-trial photographic display for the purpose of identification of a suspect. *U. S. v. Ash*, 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973). The Supreme Court has held that:

> each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

*Simmons v. U. S.*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). Factors for consideration in determining fairness include whether just one photo, that of the defendant, was shown to the witness, whether the police officer attempted to influence the witness in making his identification, whether the photo of the defendant recurs in the group of photos displayed to the witness or whether the photograph of the defendant in some way is emphasized. The Court finds that none of these factors is present in this case. At trial the witness testified that at neither the line-up nor at the original photo display did the police officers attempt to influence him in any way. Mr. Cannon also noted that on one prior occasion he had seen photos which did not include the petitioner among them and he had not chosen anyone as a suspect. Mr. Cannon also stated that in the display and in the line-up petitioner or his photo did not appear to stand out in any way. At no time was petitioner's picture alone or petitioner by himself shown to the witness for identification purposes. Petitioner had counsel present at the pre-arraignment line-up, even though failure to provide counsel at a pre-arraignment line-up is not unconstitutional. *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972); *Williams v. Marshall*, 628 F.2d 934 (6th Cir. 1980). Petitioner's counsel testified at the trial that he saw nothing out of order in the line-up. Thus, the Court finds that the photographic display and the following line-up were not impermissibly suggestive and did not create a substantial likelihood of irreparable misidentification.

Although the Tennessee Court of Criminal Appeals, when reviewing petitioner's case, did not wholeheartedly approve of showing the jury petitioner's mug shots, they found it to be harmless error as did the Magistrate and as this Court does. Only one federal habeas corpus case deals with the introduction of mug shots to a jury. In *U. S. v. Cannon*, 525 F.2d 414 (7th Cir. 1975) the Seventh Circuit held that the test for determining whether a habeas petitioner's constitutional rights were violated by introduction of his mug shots into evidence is whether, viewing the facts of the case in their totality, the resulting prejudice created by the admission of the mug shots greatly outweighed their probative value to the

jury. 525 F.2d at 421. Much as in *U. S. v. Cannon*, in the present case the mug shots went to the issue of the ability of the eyewitness to identify the petitioner as the man who he saw running from the Stop N Go market. Thus the evidence was of great probative value which outweighed greatly any possible prejudice. However, the Court finds that little prejudice was possible. As the trial judge, the appellate judges and the Magistrate all observed, the date of the mug shots was May 28, 1973 and the crime for which petitioner was on trial occurred on April 19, 1973. Therefore, the logical conclusion to be drawn by the jury was that these photos were taken of petitioner after his arrest for the charge upon which he was then being tried. Thus, petitioner's constitutional rights were not violated by the introduction of the mug shots into evidence.

■ In determining whether petitioner's constitutional rights were violated by the questioning absent counsel after the homicide line-up, this Court must give the factual determinations of the trial judge and the Tennessee Court of Criminal Appeals the presumption of correctness mandated by 28 U.S.C. § 2254(d). *Sumner v. Mata*, —— U.S. ——, 101 U.S. 764, 66 L.Ed.2d 722 (1981). Both the trial and appellate judges found that petitioner's statement was freely and voluntarily made after a knowing waiver of his constitutional rights. It is clear that once the petitioner said, "My lawyer told me not to say nothing" that the interrogation immediately ceased. This case is distinguishable from *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) in which the accused during transportation to the locale where his lawyer was located, was questioned in contravention of an agreement between police and two attorneys that he would not be interrogated until after he had spoken to the attorney at their destination and despite the accused's repeated statements that he would speak to them after he had conferred with his lawyer. In the present case, no agreement between police and petitioner's lawyer was made and petitioner did not raise his right to counsel until after he had given a partial statement.

The police officers instantly complied with his wishes and stopped the questioning. No violation of petitioner's constitutional rights occurred.

■ The Magistrate did not review any claims made by petitioner in regard to the allegedly illegal search of the car incident to his arrest which culminated in the introduction of the two pistols into evidence at the trial. *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) bars review of the petitioner's Fourth Amendment claims. The Court finds that the petitioner had opportunities for full and fair litigation of his Fourth Amendment challenges in the state court proceedings, thus this Court is barred from re-examining these claims in a habeas corpus proceeding. *See, Williams v. Brown*, 609 F.2d 216, 218 (5th Cir. 1980). Petitioner's assertion that *Stone v. Powell* was wrongly decided in no way alters this Court's views on its applicability to this case. Therefore the search and seizure claims of petitioner may not form a basis for a grant of the writ of habeas corpus.

It is therefore, by the Court

ORDERED that the Report of the Magistrate is affirmed and the writ of habeas corpus is denied.